## In re Robert Victor LINEWEAVER.

Court of Appeals of Tennessee,
Western Section, at Nashville.

Sept. 15, 2009 Session.

Jan. 28, 2010.

Permission to Appeal Denied by
Supreme Court Aug. 25, 2010.

James G. Stranch, III, C. Dewey Branstetter, Jr., and Michael J. Wall, Nashville, Tennessee, for the appellant, Robert Victor Lineweaver.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

This appeal involves a finding of civil contempt against a court clerk. Three juvenile court referees entered separate orders requiring the juvenile court clerk to produce certain court files to them on a date certain. The court clerk did not produce the files by the deadline. The referees issued show cause orders, requiring the court clerk to appear and show cause why he should not be held in contempt of court for failing to comply with the orders to produce the files. At the first show cause hearing, the court clerk produced most, but not all, of the files at issue. A second hearing was scheduled, at which the clerk produced all but two files. For the failure to produce the two missing files, the referees held the court clerk in civil contempt and ordered him to be incarcerated until the files were produced. A couple of hours later, the files were produced, and the court clerk was released. The court clerk appealed the contempt finding and was granted a *de novo* hearing

before the juvenile court judge. At the conclusion of the hearing, the juvenile court judge found the court clerk in willful contempt of court, but found also that he had purged his contempt by producing the files at issue. The court clerk now appeals. We affirm, finding that the juvenile court referees had authority to hold the court clerk in contempt and have him incarcerated until the files were produced, and that the evidence supports the trial court's finding that the court clerk willfully disobeyed the referees' lawful order.

## FACTS AND PROCEEDINGS BELOW

### Background

Appellant Robert Victor Lineweaver ("Lineweaver") has been the duly elected Court Clerk of the Davidson County Juvenile Court since 2002. The Davidson County Juvenile Court Judge is the Honorable Betty Adams Green. The juvenile court referees, judicial officers appointed to serve the Davidson County Juvenile Court, include Referee Sophia Crawford, Referee William P. Griffin, IV, and Referee William Scott Rosenberg. The bulk of the cases brought before the Davidson County Juvenile Court are heard at first instance by juvenile court referees. The rulings of a referee may be reheard *de novo* by Judge Green upon the request of an aggrieved party or upon the court's own motion. *See* Tenn.Code Ann. § 37–1–107(e) (Supp.2008).

The juvenile courts in Tennessee have jurisdiction over a wide range of matters affecting the State's children and families. The juvenile court's jurisdiction includes the protection and placement of children who are dependent, neglected, or abused; the prosecution, detention, and treatment of children who are delinquent or who commit criminal acts; the termination of parental rights; and ensuring the financial support of children whose parents have never been married to each other. *See* Tenn.Code Ann. § 37–1–101 *et seq.* Thus, virtually every Juvenile Court file involves a matter of great importance to a child or to a family.

As happens with most courts, parties sometimes file cases with the Davidson County Juvenile Court and, for whatever reason, do not prosecute or pursue the cases and yet do not voluntarily dismiss them. These dormant cases may languish on the court's docket and unnecessarily utilize the limited resources of both the court and the court clerk's office. Thus, as these dormant cases accumulate, they must from time to time be purged by involuntary dismissal of the cases for failure to prosecute.[1] This requires that the dormant cases be identified, and that the parties to these cases be notified of the impending involuntary dismissal and be given an opportunity to explain to the Court why the case should not be dismissed. Because the Juvenile Court's records and case files are kept by the Juvenile Court Clerk's Office, the task of purging dormant cases from the Court's docket requires cooperation between the Davidson County Juvenile Court and the office of Court Clerk Lineweaver.

### Emails and Orders

In accordance with its rules, the Juvenile Court instructed Lineweaver to identify the cases meeting the definition of "dormant cases" and to send notices of

---

1. Rule 15 of the Local Rules of the Juvenile Court of Davidson County defines dormant cases as cases that have not been disposed of or scheduled for hearing within twelve months of the date of filing, last summons issued, or service, whichever is later, and states that the Court may take "reasonable measures" to purge them. Rules of the Juv. Ct. for the Twentieth Jud. Dist. 15.

dismissal to all appropriate parties in the identified cases. Pursuant to this directive, Lineweaver established a tickler system designed to identify such dormant cases. Lineweaver advised the Juvenile Court that notices of dismissal would be sent to the parties forty-five days prior to the date of the "dismissal docket," *i.e.* the Juvenile Court proceeding at which the Court would dismiss the dormant cases if the parties did not satisfactorily explain their failure to prosecute. Lineweaver indicated to the Court that the case files, along with the notices and orders of dismissal, would be forwarded to the appropriate judicial officer for disposition. This "dismissal docket" system was first implemented at the beginning of 2007.

On July 19, 2007, an email from Lineweaver's administrative assistant was sent to various court personnel which stated: "Preparations were made to send out all outstanding notices for the year and including the ones for the next dismissal docket. These notices were printed and mailed. After the designated time had passed, the orders were delivered to the Parentage Division to be signed per the procedures." The next day, on July 20, 2007, Referee Rosenberg replied to all of the recipients of the email, including Lineweaver, stating that he found the email "puzzling" because the referenced orders and files had never been delivered to either the Juvenile Court Judge or to the Referees. Referee Rosenberg's reply stated, "We have asked every person in the parentage divisions and all have told us that they never received any such orders from your office. Further we have done a thorough check of the entire parentage division and there are no orders here." The record shows no response by Lineweaver or his staff to Referee Rosenberg's email.

One week later, on July 27, 2007, Referee Rosenberg sent another email to the same list of personnel, stating that "[i]t has been a week now and I have had no response to this email. Nor have I had the dismissal orders that are due today delivered to my office." Obviously frustrated by Lineweaver's disregard of his prior email, Referee Rosenberg warned, "If I don't have these by the end of the day I will be issuing an order that the files be brought to me."

Meanwhile, on July 26, 2007, Referee Crawford sent Lineweaver and others in the Clerk's office an email. The email directed Lineweaver to deliver to Referee Crawford 135 dormant case files, with notices of dismissal included, so that she could dispose of the cases on the dismissal docket scheduled for the following day. Around 10:30 the following morning on July 27, 2007, Referee Crawford sent Lineweaver an email stating that "we are still waiting on the files for our respective dismissal dockets which our Clerks have not been advised anything about." Echoing Referee Rosenberg's warning on the same day, Referee Crawford told Lineweaver that she would "hate to have to issue an Order directing the Clerk to pull these files . . . , but if necessary will do so."

As of August 1, 2007, none of the requested files had been delivered to the Referees. Consequently, on August 3, 2007, in accordance with the email warnings, the three Juvenile Court Referees each issued an order commanding Lineweaver to deliver the thirty-one enumerated files on the March 2007 dismissal docket to the Referees' respective offices by August 10, 2007. In addition, also on August 3, 2007, the Referees each issued an order commanding Lineweaver to deliver thirty-six enumerated files on the April 2007 dismissal docket to the Referees' respective offices by August 17, 2007.

By August 13, 2007, the Referees had received no response from Lineweaver, and none of the files had been delivered as ordered. Therefore, Referee Crawford issued a "show cause" order, requiring Lineweaver to appear in court before Referee Crawford and show cause why he should not be held in "willful civil contempt and sentenced to the Metropolitan Davidson County Jail" for failing to produce all of the files requested from the March 2007 dismissal docket. Lineweaver was ordered to appear in Referee Crawford's court for the "show cause" hearing on August 22, 2007. On August 20, 2007, Referee Crawford issued the same show cause order with respect to the missing case files for the April 2007 dismissal docket. Lineweaver was ordered to appear before Referee Crawford on August 29, 2007 to address his failure to comply with this order. Referees Rosenberg and Griffin issued similar show cause orders to Lineweaver.

### Show Cause Hearings

On August 22, 2007, the first show cause hearing was held as ordered before all three Referees. Lineweaver came to the hearing and brought with him four boxes of court files. Lineweaver, however, said that he could not identify the case files that were contained in each box, adding, "I'm sorry; I should have looked." Because Lineweaver had simply brought the boxes with no list or other indication of the case files that were in the boxes, the Referees indicated that they would go through the boxes to make sure that all the enumerated files were included in the boxes. The Referees told Lineweaver that they would reconvene at the previously sched-uled show cause hearing on August 29, 2007, to confirm that all of the dismissal docket files were accounted for. The next day, on August 23, 2007, Referee Crawford sent Lineweaver two separate emails informing him that three files from the March dismissal docket and six files from the April dismissal docket were not included in the boxes of files that Lineweaver had brought to the hearing the previous day. Lineweaver did not respond to the August 23 email, and the nine missing files were not produced. On August 28, the day before the scheduled hearing, Referee Crawford sent Lineweaver another email, and yet another on the morning of the hearing to remind him that the nine identified files had still not been produced.

The August 29, 2007 show cause hearing was conducted as scheduled. Lineweaver brought to the hearing only five of the nine missing files, leaving four of the identified files still missing. Referee Crawford directed Lineweaver to explain why those files were missing, stating, "I need to know why you missed them because we've been trying to get these files for a long time now. And I outlined them in detail to you almost a week ago. So I need to know why you missed them." Lineweaver responded only that he did not know why the files were missing and said that he would need to check with his staff about the matter. Referee Crawford ordered a fifteen-minute recess to give Lineweaver an opportunity to check with his staff and retrieve the missing files.

After the recess, Lineweaver returned to court with two of the four missing files.[2] When directed to explain why the other two files were not produced, Lineweaver

---

**2.** Lineweaver failed to produce *Patterson v. Patterson*, Case No. 2219–0067416, and *State v. Williams*, Case No. 2019–055743. These two files were from Referee Crawford's dismissal docket; all of the files for the dismissal dockets of Referee Rosenberg and Referee Griffin had been produced. Therefore, the civil contempt charges initiated by Referee Rosenberg and Referee Griffin were dropped.

said only that he had "[n]o excuse" and speculated that the missing files might be in other offices in the building. Finally losing patience, Referee Crawford held Lineweaver in contempt of court for failing to produce the two files:

> As I stated, Mr. Lineweaver, ... you have known since I issued a court order for you to produce these files, and I issued that court order back on August 3rd for the April Dismissal Docket and before that for the March Dismissal Docket. You have known the entire time those files were needed. So, again, the fact that those files could be in another judicial officer's office or in a courtroom is totally irrelevant to the reason you've not produced them [to] Referee Rosenberg today. You could have gotten them, regardless.
>
> Last Thursday I gave you the authority to come and get those files. As of this morning they're still sitting in my floor and the orders have not been timely sent out despite three emails to your office, Mr. Lineweaver.
>
> So with all due respect, Mr. Lineweaver, after consultation with my learned colleagues today, you have left me no alternative other than to take you to into custody until those two files are located and provided to Referee Rosenberg. You are in custody.

Thus, the Referees ordered that Lineweaver be taken into custody until the two requested files were produced. Within a short time, the two files were produced to the Referees—one had been misfiled, and the other appeared in the cubicle of Referee Crawford's assistant without explanation. Lineweaver was then released, after being incarcerated a total of about two and a half hours.

### Proceedings Before the Juvenile Court Judge

Unhappy with the turn of events, on September 6, 2007, pursuant to Tennessee Code Annotated § 37–1–107(e), Lineweaver appealed to Juvenile Court Judge Green for a *de novo* review of the Referees' collective decision to hold him in civil contempt for failing to comply with the August 3, 2007 orders. On September 11, 2007, the Referees issued a joint order consistent with the prior oral ruling, holding Lineweaver in civil contempt. The order, however, also found that Lineweaver had already "purged his contempt by producing the aforementioned files."

On September 24, 2007, Lineweaver filed a motion to strike the Referees' contempt order. On the same day, Lineweaver filed a motion for recusal of Judge Green and seeking to have his case heard by interchange by a substitute Juvenile Court Judge.[3] Before the motion for recusal was decided, Juvenile Court Judge Green appointed two Nashville attorneys[4] to serve as "Special Prosecutors" to pursue the civil contempt charges against Lineweaver. A few days later, Judge Green granted Lineweaver's motion for recusal. On May 14, 2008, the Juvenile Court Judge for Rutherford County, Judge Donna Scott Davenport, was appointed to preside over the case in place of Judge Green.

On August 29, 2008, the Special Prosecutors filed a motion to dismiss Lineweaver's appeal to the Juvenile Court Judge, arguing that the issue was moot because Lineweaver had purged his contempt. In

---

3. The motion for recusal was based on Judge Green's comments to the media to the effect that Lineweaver's performance as the Juvenile Court Clerk had been a "problem" for some time.

4. The attorneys appointed as Special Prosecutors were Philip Smith and Phillip Robinson.

response, Lineweaver argued that the case was not moot, and that, even if it were, two well-recognized exceptions to the mootness doctrine applied: (1) the case presents questions of public importance, and (2) it presents an issue capable of repetition, yet evading review. Furthermore, Lineweaver argued, the case is not moot, because of the stigma of the contempt finding and his continuing stake in reversing it.

 On September 9, 2008, Judge Davenport conducted a hearing on the motions pending at that time.[5] On November 19, 2008, she entered an order resolving the motions. Among other things, Judge Davenport held that Lineweaver's appeal was not moot because a live controversy existed and, even if moot, the public interest exception to the mootness doctrine was applicable because the issues are of great importance to the public administration of justice.[6] The trial court also denied Lineweaver's motion to strike the contempt order, concluding that the Referees had jurisdiction to enter the order. The *de novo* hearing was scheduled for January 29, 2009.

On December 19, 2008, Lineweaver filed a motion for summary judgment. He also filed "Combined Discovery Requests," propounding interrogatories, requests for production of documents, and requests for admission on the Juvenile Court of Davidson County. On January 14, 2009, Special Counsel filed a motion for a protective order, asking Judge Davenport to prevent Lineweaver from seeking discovery from the Davidson County Juvenile Court, arguing that the Court was not a "party" to the action and that such discovery tools can only be used on "parties," and also contending that Lineweaver was precluded from delving into the thought process of the trier of fact through discovery. Therefore, the Special Prosecutors requested that Lineweaver's written discovery be quashed, or that a protective order be entered. On December 30, 2008, in preparation for the scheduled hearing before Judge Davenport, the Special Prosecutors took Lineweaver's deposition, and later filed it with the Juvenile Court.

On January 28, 2009, the day before the scheduled hearing, Lineweaver filed a "Motion to Determine Authority of Counsel," asking Judge Davenport to compel the Special Prosecutors to identify their client and demonstrate their authority to represent that client in these proceedings. Lineweaver claimed that "the Office of the Attorney General has now taken the official position that the State is not a party to this case." If the Special Prosecutors were unable to identify their client, Lineweaver argued, they should be barred from further participation in the case.

On January 29, 2009, as scheduled, Lineweaver's *de novo* appeal was tried before Judge Davenport. The only two witnesses who testified at the trial were Lineweaver and Referee Crawford's administrative assistant, Margo Cooper. After the lawyers argued about, *inter*

---

5. A transcript of that hearing is not included in the appellate record.

6. Judge Davenport's holding on mootness was not challenged in this appeal. Nevertheless, on appeal, we must consider whether the issues are moot, to confirm that the appellate court has subject matter jurisdiction over this appeal. *See Carson v. Daimlerchrysler Corp.,* No. W2001–03088–COA–R3–CV, 2003 WL 1618076, at *2 n. 1 (Tenn.Ct.App. Mar. 19, 2003). We agree with the trial court that, even if the contempt finding is moot, the issues are of importance to the public interest, and are capable of repetition yet evading review. *See generally Pfister v. Searle,* No. M2000–01921–COA–R3–JV, 2001 WL 329535, at *4 (Tenn.Ct.App. Mar. 28, 2001). Thus, we find no error in the holding on mootness in the trial court below.

*alia*, whether the Special Prosecutors had authority to appear and whether civil contempt could be pursued against Lineweaver in the absence of a motion by a private party, the Juvenile Court heard Lineweaver's testimony on his own behalf.

At the outset, Lineweaver testified in general about his duties as the Juvenile Court Clerk and about the filing system for all of the Juvenile Court files in his office. Lineweaver explained that, when an authorized person is permitted to remove a case file from the Clerk's office, an orange card with an index card is put in the place of the file, indicating the person who was given the file, the office to which it was taken, and the date it was taken. He described the "dismissal docket" and the system by which the dormant cases are closed and moved to the archived files. Lineweaver indicated that he, initially, was not in favor of having such a dismissal docket, because in his opinion it was not necessary, and it placed an extra burden on his staff. Lineweaver talked about his budget problems and stated his opinion that the administrative assistants of the individual Juvenile Court Referees should have been responsible for some of the required tasks.

Lineweaver acknowledged that he had received complaints from the Referees about their inability to obtain from the Clerk's Office the dismissal docket files and the respective orders of dismissal. He conceded that the Referees had warned that if he failed to get the required files to them, they would enter an order compelling him to produce the files. Lineweaver claimed repeatedly that he and Referee Rosenberg were "working it out." Lineweaver said that the Referees received some, but admittedly not all, of the files. At any rate, he asserted, even if the physical files were not produced to the Juvenile

Court Referees, all files were accessible via the computer system.

Lineweaver was questioned about his efforts to comply with the two August 3, 2007 orders, directing him to produce the March and April dismissal docket cases to the Referees by August 10, 2007. He stated that he understood the Referees' orders, and he acknowledged that they were valid orders. Lineweaver agreed that the orders allowed him plenty of time to pull the specified files, and that it was his duty and responsibility to comply with the orders and pull those files. He acknowledged that there was "nothing to prevent [him] from complying" with the orders. Lineweaver said that when he received the Referees' orders, he gave them to a staff member, but he could not identify the staff member to whom he had given them. When asked whether he personally checked to make sure that all of the files were pulled by his staff, Lineweaver responded that he did not remember. Likewise, Lineweaver could not remember whether he delivered all thirty-one March 2007 dismissal docket files to the Referees by the August 10, 2007 deadline. Similarly, he claimed that his staff pulled the thirty-six April 2007 dismissal docket files, but conceded that he did not go through them to ensure that the required files were all there. Lineweaver professed to not remember whether those files were delivered to the Referees by the August 10, 2007 deadline. The following colloquy took place:

> [Special Prosecutor]: Mr. Lineweaver, if a court had ordered you to do something wouldn't it make sense to get them up there and go over those files with the person receiving them to make sure, number one, that you got them up there in time and make sure they were all there. Does that make sense?

[Lineweaver]: I would be involved with it; yes, sir.

[Special Prosecutor]: But you have no recollection of doing that?

[Lineweaver]: No, sir, it's way over—no, sir, I don't remember.

[Special Prosecutor]: You can't say it was done at all, can you?

[Lineweaver]: I'd have to check some of my—I don't know, no, sir. I don't remember.

Lineweaver conceded that he received the orders setting show cause hearings for August 22 and August 29, 2007, respectively. He acknowledged that the orders were plain and understandable and that the orders said that the Referees could put him in jail if he did not comply. Lineweaver, however, did not believe that the Referees would put him in jail. When asked why he did not comply by the hearing date, Lineweaver said, without elaboration, "Because we were still working out some of the procedures with [Referee] Rosenberg." Initially, Lineweaver professed to not remember whether he appeared for the August 22, 2007 hearing, but when confronted with his earlier affidavit, he recalled having attended the hearing. Nevertheless, Lineweaver did not remember if he pulled files in preparation for the show cause hearing, saying only that he was "sure [his] staff was working on it, as well as I." Lineweaver acknowledged that he did not check before the August 22 hearing to determine whether the four boxes given to the Referees contained all of the specified files. After the August 22 show cause hearing, and after he was told that nine files were still missing, Lineweaver stated, he and his staff attempted to find the nine missing files. At the second show cause hearing on August 29, 2007, he said, he brought some, but not all, of them to court. Asked whether he personally checked for every missing file, Lineweaver responded,

"I don't remember that." Asked why the two remaining files were not produced, Lineweaver conjectured that the failure was due to "human error" or the files being located in someone's office.

Judge Davenport asked Lineweaver what he meant when he testified that he did not comply with the order to produce the files because he was "working out some of the procedures with [Referee] Rosenberg." Lineweaver explained that he was referring to conversations with Referee Rosenberg in 2006 about procedures for the dismissal docket. When Judge Davenport observed that the Referees' order to produce the dormant files did not occur until 2007, Lineweaver added that they had met "another time" but he could not remember the date. When Judge Davenport asked how discussions with Referee Rosenberg about the dismissal docket related to the Referees' straightforward order to retrieve specified files, the following colloquy occurred:

Q. That's where I'm confused. How does that have anything to do with get me the files? That's what I'm confused about.

A. Well, part of it was dealing with the computer also, and I think that's on the affidavit, not affidavit, one of the transcripts, excuse me. And then we had to get—they didn't look at that, the Referees, that we had to do something for them to have them disposed of at the end, for us to do for the computers that's set up in our GYM (phonetic) System. That's some of the stuff that myself and Referee Rosenberg was working on, not only the procedures but also we had to work with Mr. Wells, no, I'm sorry, Mr. Sanders in the computer—

Q. How does that relate to the files are there or they're not there if you're

working out a procedure? Because you're not shifting the files doing this procedure; you're trying to work out a plan, right?

A. Yes, ma'am; and we're furnishing the files while we're trying to work out a plan at the same time because it was '07 when we started and this was March and April's. January and February they got the files they needed, which was just a very few because we was just starting the dormant cases or dismissal files up. And when they'd meet we'd just take the files into their office. It's set at 7 o'clock in the morning but it's just that time that it's just being used. They get the files and see if they are the dormant cases that they dismiss and then we do the rest of the work on the computer system now.

Judge Davenport did not ask Lineweaver any further questions.

Lineweaver asserted that the Juvenile Court Clerk's Office was understaffed due to budget constraints, and he described his efforts to obtain more funding. He asserted that he was not in willful contempt of court for failure to produce the files, insisting that no clerk of court is the guarantor of every file. Lineweaver said that his failure to produce the files was not willful because he "wanted [Referee Crawford] to have the file" and because his office had produced "many files" to the three Referees. Because he did not intentionally fail to produce the files, he claimed, he should not be held in contempt.

Referee Crawford's assistant Margo Cooper ("Cooper") testified briefly as well. At the show cause hearing on August 29, 2007, Cooper was in the courtroom when Lineweaver was held in contempt. Cooper testified that, when the Referees granted Lineweaver a fifteen-minute recess to lo-cate missing files, she and two other Juvenile Court employees went to her cubicle to make certain that the missing files were not in a box of files that had been in Cooper's office for several days. After a thorough search, Cooper said, none of them found a missing file in the box. They then returned to the courtroom, leaving Cooper's cubicle unoccupied. Immediately after Lineweaver was held in contempt, Cooper and her supervisor went to Cooper's cubicle to check the box again. She then found one of the missing files in the box that had been thoroughly searched previously. Cooper was convinced that the file was not in the box before the hearing, but she had "no idea" how the file turned up in the box after the hearing. In her absence, Cooper said, a number of court employees would have had access to her cubicle.

At the conclusion of the Special Prosecutor's proof, Lineweaver moved to dismiss for lack of proof on contempt. This motion was denied. Thereafter, Lineweaver rested his case and chose not to submit additional proof in his defense.

At the conclusion of the hearing, Judge Davenport issued an oral ruling, finding that Lineweaver was in willful civil contempt of court for failing to produce the two files as ordered by the Referees. She specifically found that, based on Lineweaver's "avoidance and lack of memory," his testimony was not credible. Judge Davenport noted that Lineweaver submitted no proof that he personally took *any* action to locate the specified files in a timely manner. Despite the clarity of the Referees' directive to Lineweaver, she found, "he intentionally, not accidentally, not inadvertently, failed to comply" with the Referees' orders.

On March 5, 2009, Judge Davenport issued a written order consistent with her oral ruling. The order first disposed of

pending motions; it denied Lineweaver's motion for summary judgment, denied Lineweaver's motion to determine the authority of the Special Prosecutors as untimely, and granted the Special Prosecutors' motion for a protective order. Judge Davenport then evaluated the evidence and found that it established that Lineweaver failed to comply with Referee Crawford's order, and that he did so willfully. In the written order, Judge Davenport observed that, "during the examination of Mr. Lineweaver regarding what actions he took to comply with the Court's order, he repeatedly claimed a lack of memory or attempted to avoid answering the question." Judge Davenport found that Lineweaver's evasiveness indicated willfulness, and stated:

> This Court finds that the Juvenile Referees gave Mr. Lineweaver repeated opportunities to comply with the Court's Orders. Mr. Lineweaver understood his duty and legal responsibility to maintain and keep up with the files in his care which is his responsibility alone. The Court finds that Mr. Lineweaver acted as if the Orders of Court were mere suggestions; that Mr. Lineweaver had no intention of timely producing the files as ordered by the Court although he had the ability to do so, and therefore his failure to comply with the Court's two (2) Orders of August 3, 2007 was willful in nature.

Judge Davenport recognized that the Juvenile Courts of Tennessee have the inherent power to enforce their orders. *See* Tenn.Code Ann. § 29-9-101 *et seq.* Judge Davenport concluded further that Lineweaver "has now purged himself as the files in question have been produced and are now back in the care of the Davidson County Juvenile Court Clerk." Therefore, no penalties or sanctions were assessed against Lineweaver. From this order, Lineweaver now appeals.

## STANDARD OF REVIEW AND ISSUES ON APPEAL

Lineweaver raises four issues on appeal:

1. Whether the Juvenile Court erred as a matter of law by holding Lineweaver in civil contempt without a request from a private party to do so?

2. Whether the Juvenile Court should have allowed Special Counsel to participate in the litigation, even though they represented no party?

3. Whether the Juvenile Court erred by granting a protective order that prevented Lineweaver from obtaining any written discovery?

4. Whether the evidence at trial established that Lineweaver willfully disobeyed an order from the Juvenile Court Referees?

The first two issues raised by Lineweaver are purely questions of law, which we review *de novo*, affording no presumption of correctness to the trial court's decision. *Lichtenwalter v. Lichtenwalter*, 229 S.W.3d 690, 692 (2007). The trial court's decision to grant or deny a motion for a protective order in connection with a discovery request is a matter within the sound discretion of the trial court, and such a decision will be overturned only if the trial court abused that discretion. *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 150 (Tenn.Ct.App.2007). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001)). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court; rather, the trial court's discretionary ruling "will be upheld so long as reasonable

minds can disagree as to the propriety of the decision made." *Id.*

■ Whether a person charged with civil contempt for violating a trial court's order actually violated that order is a question of fact. *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 356 (Tenn.2008). A trial court's findings of fact are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *See* Tenn. R.App. P. 13(d). Once it has been determined by a preponderance of the evidence that a person has willfully violated a lawful and sufficiently clear and precise order, the court may, in its discretion, hold the person in civil contempt. *Id.* at 358 (citing *Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 377 S.W.2d 908, 912 (1964)). The trial court's decision to hold a person in civil contempt is entitled to great weight, and it is reviewed under the abuse of discretion standard set out above. *Id.* (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn.1993)), and (*Moody v. Hutchison*, 159 S.W.3d 15, 25–26 (Tenn.Ct.App.2004)).

## Analysis

### Overview

A clerk of a court is a ministerial officer of the court, whose duties include the clerical part of the court's business. 15A Am. Jur.2d *Clerks of Court* § 1 (2000). As such, the clerk is charged with overseeing and keeping all documents used by the court in its decisionmaking responsibilities. *Id.* at § 27. Specifically, under Tennessee statutes, the court clerk must keep the court files and documents "with care and security." *See* Tenn.Code Ann. § 18–1–105(a)(8) (Supp.2008). In the performance of his ministerial duties, the court clerk acts under the exclusive jurisdiction and direction of the court. 15A Am.Jur.2d *Clerks of Court* at § 27. As a public offi-

cer, the court clerk is answerable for malfeasance, omission or neglect in the discharge of his duties. *Id.* at § 30. If the court clerk fails to obey an order of the court, he may be guilty of contempt. *Id.* at § 21.

■ In Tennessee, the Clerk of the Juvenile Court is an elected public official. *See* Tenn. Const., art. VI, § 13; *see also Shelby County Election Comm'n v. Turner*, 755 S.W.2d 774, 777 (Tenn.1988) (juvenile court is an "inferior court" within the meaning of the Tennessee Constitution). The fact that the clerk is independently elected, however, does not diminish the court's role in overseeing the court clerk's maintenance of the court's records. Courts have inherent supervisory authority over the court records and files. *In re NHC–Nashville Fire Litigation*, 293 S.W.3d 547, 561 (Tenn.Ct.App.2008).

The issues in this appeal involve the contempt powers of the Juvenile Court Judge as well as the Juvenile Court Referees. The derivation of the court's contempt powers has been described as follows:

[The] Court ... often operates upon the *person* of the parties, commanding them to do certain specified acts. It is manifest that if the Court had no power to enforce obedience to such decrees they would be wholly ineffectual, and would be absolutely disregarded. The violation of the decree of a Court is termed a contempt....

The power to punish for contempt is one of the most significant prerogatives of a Court of Justice.... The mandates of a Court ... must in all cases be obeyed promptly, faithfully and without question or evasion. The party['s] ... simple duty is to obey, and when he disobeys it is a duty the Court owes to

itself and to the public to impose appropriate sanctions.

GIBSON's SUITS IN CHANCERY, Eighth Ed., § 25.01 at 25-1. "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)). At common law, this power was broad and undefined. *See Nye v. United States*, 313 U.S. 33, 43–47, 61 S.Ct. 810, 85 L.Ed. 1172 (1941).

▮ In Tennessee, the courts' contempt powers are now governed by statute. *Konvalinka*, 249 S.W.3d at 354. Tennessee Code Annotated § 16–1–103 states that, "[f]or the effectual exercise of its powers, every court is vested with the power to punish for contempt, as provided for in this code." The Code provisions referred to in Section 16–1–103 are contained in Tennessee Code Annotated § 29–9–101 to –108. Section 29–9–102 outlines the scope of courts' contempt power:

> **Scope of Power.**—The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
>
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
>
> (3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;

> (4) Abuse of, or unlawful interference with, the process or proceedings of the court;
>
> (5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or
>
> (6) Any other act or omission declared a contempt by law.

Tenn.Code Ann. § 29–9–102 (2000).

▮ Contempt may be classified as either civil or criminal contempt, depending on the action taken by the court to address the contempt. *Ahern v. Ahern*, 15 S.W.3d 73, 78 (Tenn.2000). Where the court imprisons or fines an individual simply as punishment for the contempt, this is referred to as criminal contempt. *Id.* "A party who is in criminal contempt cannot be freed by eventual compliance." *Id.* This remedy is set forth in Section 29–9–103, which provides:

> **Punishment.**—(a) The punishment for contempt may be by fine or by imprisonment, or both.
>
> (b) Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days, and, except as provided in § 29–9–108, all other courts are limited to a fine of ten dollars ($10.00).

Tenn.Code Ann. § 29–9–103 (2000).

▮ In contrast, where the court imprisons an individual to compel performance of a court order, this is referred to as civil contempt. *Ahern*, 15 S.W.3d at 79. "Thus, with civil contempt, the one in contempt has the 'keys to the jail' and can purge the contempt by complying with the court's order." *Id.* If the court seeks to compel compliance with its order, the remedies are set forth in Sections 29–9–104

and 105. If the contemnor has performed an act that was forbidden by the court's order, and the court seeks to rectify the contemptuous act, Section 29–9–105 states that "the person may be imprisoned until the act is rectified by placing matters and person in status quo, or by the payment of damages." Tenn.Code Ann. § 29–9–105 (2000). If, however, the contemnor has failed to perform an act that he was ordered to perform, and the court seeks to compel performance of the act, Section 29–9–104 outlines the remedy:

> **Omission to perform act.** (a) If the contempt consists of an omission to perform an act which it is yet in the power of the person to perform, the person may be imprisoned until such person performs it.
>
> (b) The person or if same be a corporation, then such person or corporation can be separately fined, as authorized by law, for each day it is in contempt until it performs the act ordered by the court.

Tenn.Code Ann. § 29–9–104 (2000). Thus, it is not the fact of punishment but rather its character and purpose that distinguishes between civil and criminal contempt.[7]

The Tennessee Supreme Court has set forth the elements of a claim of civil contempt:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Konvalinka,* 249 S.W.3d at 354–55 (footnotes omitted).

### Court's Authority

At the outset, Lineweaver challenges the authority of the trial court below to impose on him the remedy for civil contempt, *i.e.,* to incarcerate him in order to compel compliance with the trial court's order. Lineweaver does not challenge the trial court's authority to order him to produce the files in question. He likewise acknowledges that the trial court had the authority to impose the remedy for criminal contempt, that is, to incarcerate him for failing to comply with the order, without permitting him to purge the contempt and free himself by complying with the order. Instead, Lineweaver argues that the trial court could not take action to compel compliance with its lawful order because the contempt did not arise in the context of an action filed by a private party, and the remedy was not requested by a private party.

In support, Lineweaver cites cases describing civil contempt as an "action brought by a private party" and characterizing the remedy for civil contempt as designed to benefit a private party. *See, e.g., Doe v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.,* 104 S.W.3d 465, 474 (Tenn. 2003). He also cites a case involving a child support dispute, in which the obligee mother had waived her right to seek contempt sanctions against the obligor father for his failure to pay child support. *State ex rel. Agee v. Chapman,* 922 S.W.2d 516, 518–19 (Tenn.Ct.App.1995). Despite her waiver, the trial court incarcerated the obligor father for six months or until he purged himself of the contempt by paying the child support arrearage. *Id.* at 519.

---

**7.** We observe that the statutes setting forth the court's contempt powers do not utilize the terms "civil" and "criminal" contempt. *See* Tenn.Code Ann. § 29–9–101 *et seq.*

The *Agee* court noted that "criminal contempts are directed against the dignity and authority of the court" and, in contrast, described civil contempts as "imposed for the benefit of a party litigant." *Id.* The court observed:

> [T]he general rule seems to be that, since the sanction is imposed for a party's benefit, the party has the power to waive that benefit. If a party does not seek to hold the opposing party in contempt, the court cannot impose civil sanctions on its own motion.

*Id.* (citations omitted). On this basis, the Agee court reversed the sentence for contempt imposed on the obligor father. *See also Pickern v. Pickern*, No. E2004–02038–COA–R3–CV, 2005 WL 711964, at *6 (Tenn.Ct.App. Mar. 29, 2005).[8]

▬ The *Agee* case is, of course, readily distinguishable from the instant case, in that the order violated by the obligor father was imposed for the benefit of the mother, and thus could be waived by her. Indeed, all of the cases relied upon by Lineweaver, describing civil contempt as generally being "for the benefit of a party litigant," involve disputes between individual litigants. This reflects the fact that, almost without exception, the courts' relationship with officers of the court whose duties affect the administration of justice is harmonious. The case at bar presents the highly unusual circumstance in which a court finds it necessary to issue an order to compel a court clerk to perform his lawful duties, in order to ensure the orderly administration of justice. Lineweaver cites no case in Tennessee history in which a Tennessee court has deemed it necessary to issue such an order, and we have found none. In other states, on rare occasion, an officer of the court has been held in contempt for disobeying an order requiring him to perform his duties. *See, e.g., Ex parte Hughes*, 759 S.W.2d 118 (Tex.1988) (court clerk held in contempt for failing to comply with courts' order to mail trial docket to attorneys); *Epps v. Commonwealth*, 46 Va.App. 161, 616 S.E.2d 67 (2005) (sheriff held in contempt for failing to comply with court order to provide courtroom security).

Lineweaver does not, and indeed cannot, contest the trial court's authority to order him to produce specified files. However, this authority would be "wholly ineffectual" without the concomitant power to enforce obedience to the court's lawful order. *See* GIBSON'S SUITS IN CHANCERY, § 25.01 at 25–1. Lineweaver urges this Court to hold that the trial court could incarcerate Lineweaver in order to punish him for his failure to comply, but could not incarcerate him for the purpose of coercing his compliance. This is sheer folly. The legislature has recognized the court's contempt powers as necessary "for the effectual exercise of its powers." Tenn.Code Ann. § 16–1–103 (1994). The court's contempt powers specifically extend to address "the willful disobedience or resistance of any officer of such courts ... or any other person, to any lawful ... order ... or command of such courts."[9] Tenn.Code Ann. § 29–9–102(3).

The statutes outlining the court's contempt powers provide expressly that, in the case of a contempt that consists of an omission to perform an act required under

---

**8.** Although the court in *Pickern* recited the statement in *Agee* that "the court cannot impose civil sanctions on its own motion," it vacated the finding of contempt on the basis that the obligor father was entitled to notice and an opportunity to respond to the contempt allegations. *Pickern*, 2005 WL 711964, at *6.

**9.** Lineweaver conceded in his testimony that he considered himself to be an "officer of the court."

a court order, the person subject to the order "may be imprisoned until such person performs it." Tenn.Code Ann. § 29–9–104. Lineweaver has cited no language in the statute purporting to limit the court's power to cases in which the contempt finding is sought by a private party, and we find none.[10] Thus, we find that the Juvenile Court was specifically authorized under Section 29–9–104 to incarcerate Lineweaver for the purpose of coercing his compliance with the lawful order requiring him to produce the Juvenile Court's files.

### Special Counsel

Lineweaver next argues that the appearance of the Special Counsel was unauthorized in that the Juvenile Court order appointing the Special Counsel to prosecute Lineweaver's appeal of the Referees' contempt holding did not identify whom they would represent. He claims that the trial court had the authority to appoint special counsel only to prosecute a criminal contempt, but not a civil contempt. *See Black v. Blount*, 938 S.W.2d 394, 402 (Tenn.1996). Therefore, Lineweaver contends, the trial court's finding of civil contempt must be reversed.

■ Lineweaver challenged the authority of Special Counsel by filing a "Motion to Determine Authority of Counsel" on January 28, 2009, the day before his *de novo* hearing before the Juvenile Court. Special Counsel filed a response arguing, among other things, that Lineweaver's challenge to their authority was untimely and had been waived, noting that, at that point, Lineweaver had participated in several motions before the Court opposite the Special Counsel, without objection. Moreover, Rule 10b of the Davidson County Juvenile Court Local Rules requires that motions be filed at least fourteen days prior to setting them for a hearing. Because Lineweaver's motion was filed one day before it was to be heard (at trial on January 29), and because no special setting had been arranged, they argued, the motion was untimely. The trial court agreed and denied Lineweaver's motion as untimely.

We find no error in the trial court's decision to deny Lineweaver's challenge to the authority of the Special Prosecutors in this matter, in that his motion was admittedly untimely. Moreover, the trial court appointed Special Counsel because "the interest of justice require[d]" it. For these reasons, we reject Lineweaver's argument that the contempt finding must be reversed on this ground.

### Discovery

Lineweaver next argues that the Juvenile Court erred by granting the protective order requested by the Special Prosecutors, because it effectively barred him from conducting discovery and prevented him from fully developing his defense to the contempt charge.

■ Rule 26.03 of the Tennessee Rules of Civil Procedure sets forth the standard of review for a protective order:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense....

Tenn. R. Civ. P. 26.03. Decisions regarding whether to grant a protective order

---

**10.** Such an interpretation of the statute would arguably render the statute in violation of the doctrine of separation of powers, as infringing on the court's inherent authority to ensure the orderly administration of justice. *See generally,* Am.Jur.2d *Contempt* § 30.

are within the sound discretion of the trial court. *Adoption Place*, 273 S.W.3d at 150.

█ The only issue before the trial court at the civil contempt hearing below was whether Lineweaver willfully failed to comply with the court's straightforward order to produce specified files. Lineweaver has not demonstrated that any of the discovery sought related to Lineweaver's own efforts to comply with the order, and evidence of Lineweaver's personal efforts was the only proof relevant to the issues before the trial court. Consequently, we find that "good cause" was shown, and that the trial court did not abuse its discretion in granting the protective order requested in this case.

### Willful Disobedience

Finally, Lineweaver argues that the evidence preponderates against the trial court's finding that he willfully disobeyed the August 3, 2007 orders of the Juvenile Court Referees, directing him to produce the March and April files by August 10 and August 17, respectively. Lineweaver does not dispute that the Juvenile Court's order directing him to produce specified files was lawful, that the order was clear, specific and unambiguous, and that he did not obey the order. *See Konvalinka*, 249 S.W.3d at 355. He argues only that his failure to obey the order was not willful. *Id.* Because willfulness is required, *see* Tennessee Code Annotated § 29–9–102(3), Lineweaver contends that the trial court erred in holding that he was in contempt of court. *See Konvalinka*, 249 S.W.3d at 355.

█ The court in *Konvalinka* described the standard for willfulness in a civil contempt proceeding:

In the context of a civil contempt proceeding under Tenn.Code Ann. § 29–9–102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. Rather, willful conduct "consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." ... Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding.

*Id.* at 357 (citations omitted). The Court emphasized that the determination of whether the contemnor's violation of a court order was willful "is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility." *Id.*

█ Here, the Special Prosecutors attempted to establish the willfulness through Lineweaver's own testimony. Although Lineweaver denied that his failure to obey the Referees' orders was willful, the trial court below expressly found that his testimony was not credible. There is ample evidence to support this conclusion.

Faced with questions about what he did to produce the files specified in the Referees' order, Lineweaver offered an array of non-responsive answers. These included complaints about the lack of financial resources for the Juvenile Court Clerk's Office, descriptions of his attempts to secure more funding, references to 2006 discussions with Referee Rosenberg about the procedures for the dismissal docket, assertions that judicial officers sometimes fail to return checked-out files, observations that court files are scanned and can be accessed by computer, and claims that many files other than the files specified in the orders are regularly furnished to the Referees. None of these responses are pertinent to the singular issue, namely, whether Lineweaver acted contrary to his known duty under the Referees' orders to produce to them the specified files.

Pressed to describe his efforts to produce the files, Lineweaver could only say that he passed the Referees' orders along to unidentified staff in his office, adding that he had "helped." When pressed further, he repeatedly claimed that he was unable to remember events such as whether he attended his own show-cause hearing, each time apologizing for his lack of memory. As noted by Judge Davenport, in the entirety of Lineweaver's testimony, there was no proof of any personal effort by Lineweaver during the entire month to locate the files for the Referees. The Referees' emails, and even their orders, were simply ignored. Even after the show cause orders were issued, no effort was made to get the files to the Referees in advance of the scheduled show cause hearings. When Lineweaver appeared at the first show cause hearing, he had with him boxes of files, apparently gathered by his staff, but had no idea which files were in the boxes until informed later by the Referees. Only the threat of imminent incarceration motivated Lineweaver to find seven of the nine missing files, and only actual incarceration produced the remaining two.

Lineweaver argues that his disobedience of the Referees' order should not be deemed willful because he professed to "want" the Referees to have the specified files. This assertion rings hollow indeed. The evidence shows that, underneath the thin veneer of words, Lineweaver's actions amounted to utter indifference in the face of the court's order to take action to produce the needed files. His actions were clearly "contrary to [his] known duty" and constitute willful violation of the Referees' direct order. See id.

As Clerk of the Juvenile Court, Lineweaver had charge of court files that represented matters of grave concern to children and families within the Juvenile Court's jurisdiction. The fact that the Juvenile Court Referees found it necessary to order Lineweaver to produce files necessary for them to conduct the Court's important work is disturbing in and of itself. His willful disobedience of that order is deeply troubling. After a careful review of the entire appellate record, we must conclude that the trial court did not err in holding Lineweaver in contempt of court and in incarcerating him to compel compliance with its lawful orders.

CONCLUSION

We affirm the decision of the trial court. Costs on appeal are to be taxed to Appellant Robert Victor Lineweaver and his surety, for which execution may issue, if necessary.