IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 23, 2012 Session

**S.A.M.D. v. J.P.D.**

**An Appeal from the Circuit Court for Shelby County**
**No. CT-005438-06      Donna Fields, Judge**

**No. W2011-01256-COA-R3-CV - Filed October 25, 2012**

This post-divorce proceeding involves modification of the primary residential parent designation and contempt. The final decree of divorce designated the mother as the child's primary residential parent. Subsequently, the mother was found in criminal contempt for failure to adhere to the parenting plan; her sentence was suspended provided there were no violations of the trial court's orders. A few months later, the mother was found to have further violated the trial court's orders. Consequently, the trial court ordered the mother to serve  a portion of the suspended jail sentence imposed in the prior contempt order. In addition, the trial court held that a substantial and material change in circumstances had occurred, and it modified the parties' parenting plan to designate the father as the primary residential parent. The mother now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is
Affirmed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Drayton D. Berkley, Memphis, Tennessee, for the Plaintiff/Appellant S.A.M.D.

Vickie Hardy Jones, Memphis, Tennessee, for the Defendant/Appellee J.P.D.

## OPINION

Plaintiff/Appellant S.A.M.D. ("Mother") and Defendant/Appellee J.P.D. ("Father") were married in 2001 and had one child during the marriage, a son ("Son" or "the child") born in July 2003.[1] They divorced in February 2010.

The February 2010 final decree of divorce incorporated an agreed marital dissolution agreement ("MDA") and permanent parenting plan ("Parenting Plan"). Under the Parenting Plan, Mother was designated as the child's primary residential parent. Father travels extensively for his work, so the Parenting Plan provided he would have flexible parenting time, six days each month when his work permitted, so long as Mother was properly notified. The parties divided summer and holiday parenting time.[2]

On June 7, 2010, Father filed a contempt petition against Mother; the petition also sought injunctive relief and attorney fees ("June Contempt Petition"). Father asserted in the petition that Mother had violated the provisions of the Parenting Plan on Father's parenting time. He claimed that Mother had consistently failed to cooperate in arranging his parenting time and had refused Father his parenting time unless he gave written confirmation that his girlfriend would not be present. Of immediate importance, Father alleged that he asked to exercise his parenting time from June 7 through June 13, 2010, because he would be participating in a local work-related event that week. Father claimed that Mother had refused this request unless Father certified that his girlfriend would not be present. Father also alleged in the June Contempt Petition that Mother had violated the provisions in the MDA that prohibited harassment and threats and prohibited the parties from placing telephone calls or sending text messages to the other party after 10:00 p.m. except in the event of an emergency involving the child. Father asked the trial court to hold Mother in civil and criminal contempt for violating the Parenting Plan and the MDA, as incorporated into the final decree. Father also requested injunctive relief, enjoining Mother from denying Father his parenting time during the week of June 7, 2010, and from harassing him during that week. He also requested that Mother be required to pay his attorney fees in connection with the motion.

The trial court held a preliminary hearing on Father's June Contempt Petition on the day that it was filed. On June 18, 2010, the trial court entered a preliminary order which appears, at

---

[1]The trial court below entered an order sealing the entire record in this case. For this reason, we refer to the parties by initials only.

[2]The Parenting Plan allocated Father six weeks of parenting time during the child's summer vacation. Father, in turn, was to notify Mother by May 15 each year about the weeks in which he intended to exercise his summer parenting time.

least in part, to memorialize oral rulings made at the conclusion of the June 7, 2010 hearing.[3] The order granted Father's request to exercise parenting time the week of June 7, 2010. To curtail Mother's harassment, the trial court enjoined her from coming within 500 feet of Father "at any time or any place pending further orders of the Court." The trial court noted in the order that it had not prohibited Father's girlfriend from being around Son, and so specifically permitted her to be present during Father's parenting time. The order stated that, based on Father's petition and the trial judge's own observations, "Mother's mental condition is in controversy," and so, *sua sponte,* the trial court ordered Mother to undergo a psychiatric evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure "within 30 days of June 7, 2010." The order stated: "The Court requests that the evaluation be completed and a report prepared thereon prior to the hearing on Father's petition." The trial court set Father's contempt petition for a full hearing on July 2, 2010.[4]

On July 2, 2010, the trial court conducted the hearing as scheduled. The appellate record does not include a transcript of that hearing, but it does include 15 exhibits introduced into evidence at the hearing. The exhibits include emails and text messages between the parties, as well as Mother's deposition.[5]

On July 15, 2010, the trial court issued a detailed six-page order on the June Contempt Petition. Among other things, the trial court found Mother guilty on four counts of criminal contempt for willful violation of the Parenting Plan by denying Father parenting time with Son. She was sentenced to 40 days in jail, ten days for each of the four counts. Mother was also found to have willfully violated the Parenting Plan by sending Father harassing text messages, and she was sentenced to an additional ten days in jail for this violation. The trial court suspended Mother's sentence, conditioned on her continued compliance with the trial court's orders. The order warned: "[I]f Mother violates any order of the court in the future, she will have to serve the sentence imposed by this order."

The July 15, 2010 order also further delineated the parties' parenting rights and obligations in the apparent hope that detailed instructions and parameters would allow the parties to co-parent. The order permitted Father to have parenting time for half of the child's summer vacation in 2010 and 2011, with proper notice to Mother, and specified that the child could travel with Father during his parenting time, including trips out of the country. It found that

---

[3]The appellate record does not include a transcript of the June 7, 2010 hearing.

[4]On June 29, 2010, the trial court entered an order permitting counsel for Mother to withdraw, and Mother retained her current counsel soon thereafter.

[5]Mother's deposition was taken the day before the hearing.

Mother had "interfered with Father's ability to communicate with the child by telephone." For this reason, the trial court ordered that Father "shall be allowed to speak with the child by telephone daily," without Mother present in the room during the call. Mother was admonished not to coach the child. The order enjoined both parties from sending text messages or making telephone calls to the other after 9:30 p.m. Central Standard Time, except for text messages on emergencies concerning the child.

The July 15, 2010 order noted that Mother had provided documentation showing that she had undergone the psychiatric evaluation ordered on June 18, 2010. It stated that Mother had indicated that a report of the evaluation would be completed within a week of the hearing. In light of this, the hearing on the results of Mother's psychiatric evaluation was reset to allow Mother time to obtain and produce a copy of the report.[6]

Finally, in the July 15, 2010 order, the trial court noted that Son was in need of speech therapy, and it found that the two days per week that the child attended such therapy at school was insufficient. The trial court ordered the parties to "cooperate in scheduling speech therapy for the child" and to promptly report to the trial court on the status of the speech therapy."[7] Finally, Mother was ordered to pay $2,000 of the attorney fees Father incurred in connection with his June Contempt Petition to be paid "at a rate of $200 per month, commencing August 2, 2010, and due on or before the second day of each month thereafter."

On September 22, 2010, Father filed another contempt petition ("September Contempt Petition"), alleging that Mother had continued to disregard the trial court's orders. Father claimed that Mother had violated the trial court's orders by (1) failing to cooperate in scheduling his summer parenting time; (2) interfering with his daily telephone access to the child on specified dates during the summer; (3) failing to provide him with a copy of the results of Mother's psychological evaluation; (4) failing to take the child to speech therapy and failing to communicate with Father regarding the speech therapy, and (5) failing to pay Father attorney fees as set out in the July 15, 2010 order. Based on Mother's continued defiance of the trial court's orders, Father asked the trial court to lift the suspension on Mother's 50-day sentence, and to require Mother to serve that sentence as stated in the July

---

[6]The July 15, 2010 order was apparently drafted well in advance of its entry, because it sets a hearing on the results of Mother's psychiatric evaluation for July 13, 2010, two days before the order was entered. A later pleading filed by Father indicates that the trial court conducted a status conference on July 13, 2010, but Mother did not produce the report on her psychiatric evaluation at that time. The appellate record does not include a transcript of the July 13, 2010 conference.

[7]Again, the scheduled report date for the speech therapy was July 13, 2010.The record does not reflect whether Son's speech therapy was addressed at the status conference held on that date.

15, 2010 order. Father asked the trial court to place Son in his primary care during Mother's incarceration.

Father's September Contempt Petition also included concerns regarding Son's safety and welfare while in Mother's care. Father claimed that Mother had been leaving Son, then seven years old, in the care of her son from a previous relationship, who was 11 years old at the time. He asked the trial court to enter an order requiring that Son be supervised by an adult until he turns 12 years old. Father also requested an award of attorney fees incurred in filing the petition.

On November 16, 2010, Father filed another pleading, amending and supplementing the September Contempt Petition ("Supplemental Contempt Petition"). This pleading recounted more incidents in which Mother had refused to cooperate in scheduling Father's parenting time and used the child to harass Father. For example, Father alleged that Mother used Son to call Father at 12:54 a.m. while Father was working at an out-of-town event with a very early start time the next morning. Father's Supplemental Contempt Petition noted that there was no emergency pertaining to the child and asserted that the purpose of the call was simply to harass Father. The Supplemental Contempt Petition included other concerns about Mother's care of Son. It alleged that, during the 2010-2011 school year, Son had been tardy to school ten times, had been absent four days, and had missed portions of three additional school days. All of this, Father argued, demonstrated that Mother was both disregarding the orders of the trial court and failing to meet her responsibilities to the child.

On December 16 and 17, 2010, the trial court conducted an evidentiary hearing on Father's September and Supplemental Contempt Petitions. At the hearing, Father admitted that Mother had recently gotten into compliance with the trial court's orders, but asserted that she refused to do so until he filed his contempt petitions. For this reason, Father insisted that Mother was guilty of criminal contempt. The trial court heard testimony, first from Father and then from Mother, about the allegations in Father's contempt petitions. They gave widely divergent accounts of the relevant events.

Father first described incidents during the summer of 2010 in which Mother refused to allow him to exercise parenting time when requested. Father said that he talked to Mother about taking Son to Ireland and to Britain for three weeks in July 2010, and also to other work-related events that were out of the country. In response, Mother "flat out said no,"[8] taking the position that Father could not have more than six consecutive parenting days with the child. Since the July 2, 2010 hearing, Father said, he had made several attempts to arrange

_____

[8]In his testimony, Father mentioned events in Scotland and Canada; he did not give the dates of those events but claimed that they would have been over well before Son started school in the fall.

-5-

parenting time, but Mother was uncooperative and had allowed him to have only six to eight days with the child.

In contrast, Mother claimed that Father never called her between July 2 and August 2010 to arrange parenting time with the child. She denied Father's assertion that she refused to allow him to take the child to Ireland and/or Britain in July 2010. Mother said that she was willing to allow Father parenting time at any time, but maintained that Father simply did not call her after he returned from his three-week trip. Asked how many parenting days Father had during the summer and fall of 2010, Mother could not say, offering only that he "had [the child] some time." She indicated that Father had overnight parenting time with the child on September 10, 2010, but beyond that could say only that Father may have had parenting time "one more weekend or something after that" up until the December 16, 2010 hearing.

Father also asserted that, since the July 2010 hearing, Mother had continued to interfere with his telephone communication with Son. Father gave detailed testimony about numerous instances where he called Son, both on Mother's cell phone and on their home telephone, and got no answer and no return call, and Father submitted his telephone records to support his testimony. Some of the calls were in advance of Father's trip to Ireland, some were from Ireland, some were after Father returned from Ireland in advance of Son's birthday to ask Son what he wanted for his birthday. Father said that he was able to speak to the child for "maybe 10 seconds" before he boarded his plane for Ireland and could not reach him at all while he was in Ireland. When Son finally returned his call on July 20, 2010, Father stated, the child was in Mother's car with her, and when Father asked Son what he wanted for his birthday, Father heard Mother in the background saying, "send money, send money, money, money, money." Father's calls to Son in late July and in August 2010 to talk to him about starting school, and his text message to Mother asking her to have Son call him, went unanswered until the child finally returned the telephone call from Mother's car on the way to school, again with Mother present.

Mother did not dispute that Father had difficulty reaching the child at the times indicated by Father. On one occasion when Father could not reach Son, she explained, she was at a casino with friends and the child had gone with Mother's parents to buy fireworks for the July 4 holiday. On July 20, 2010, Mother stated, Father did not call the child, the child called him. When Son returned Father's call about his birthday, Mother conceded that she was in the car with the child at the time; she said that she saw no need to pull the car over and get out during Son's conversation with Father. Mother specifically denied saying anything like "money, money, money" during the call.

Father gave differing perspectives on a telephone call made to Father from Mother's cell phone at 12:53 a.m. on September 20, 2010, when Father was in New Jersey for a work-

related event. Father was in bed when his telephone rang because he was scheduled to start work the next morning at 6:00 a.m. When he saw that the call was from Mother's cell number, he answered the telephone because he thought it must be an emergency situation involving the child. Instead, Father said, Son was on the line, and he told Father that nothing was wrong. Mother then took the telephone from Son and began rambling at Father, talking about money. Father said that she "was pretty drunk and was kind of just being mean and stuff. So I hung up on her." Mother admitted the call to Father, but noted that it was 11:54 p.m., not 12:54 a.m., in her time zone. She claimed that she called Father because she was having trouble getting Son to go to sleep and the child wanted to talk to Father, so she dialed Father's number and handed her cell phone to the child. Mother testified that she apologized to Father for calling so late, and that she did not think it was a "big deal" because Father's work-related event was a nonpaying one. Mother denied that she was "belligerent drunk" when she called Father.

Father also testified about texts from Mother that were harassing or outside the limits imposed in the trial court's July 15, 2010 order. Father testified specifically about two text exchanges in which Mother was gratuitously sarcastic and insulting toward Father. In August 2010, Mother texted Father to ask him to send her an insurance card for the child via overnight delivery; Father told her that he had already sent cards to her and asked Mother if she had lost them. Mother responded: "No u did not and no I did not. Thanks and have a nice day and send one." When Father replied that he had sent Mother two already, she responded: "Ok lord fartsworth just send [Son] a card and have a nice day." In October 2010, the following text exchange occurred:

> [Father:] Want to get [the child] not this weekend but following weekend that ok
> [Mother:] Of course it would be nice if you spent some time with him. He is on fall break now but I guess it is too inconvenient for you at the moment to see him
> [Father:] Want to get little [the child] not this weekend
> [Mother:] So you haven't had one chance to see him since his mini trip to the game?
> [Father:] No I've been on road and overseas I work remember

Father characterized the October 2010 exchange as typical of Mother's attitude and lack of cooperation when he attempted to schedule parenting time. In response, Mother conceded that she might have been "snippy" in the October text exchange, but said that it was because she knew Father had been in town nine days but had spent them at a casino and had not attempted to see Son.

-7-

Father said that, although Mother underwent the psychological evaluation required by the trial court, she was not forthcoming in delivering the report of the evaluation to his attorney in a timely manner. Father said that his attorney did not receive a copy of the report until 5:57 p.m. the evening before the scheduled December 16 hearing. In her testimony, Mother acknowledged that she got the report several weeks before the scheduled hearing, and even called Father to tell him that she had received it. Nevertheless, she admitted, she did not give Father a copy of the report until the day before the hearing. Her only explanation was that she put the evaluation report in her car and left it there: "I rode it around in my car. . . . I thought we would just bring it when we came this time because it was after this that I got it."

When he filed the September Contempt Petition, Father testified, his main concern was that Son was not getting proper speech therapy for his stutter, as was ordered by the trial court. Father noted that the child's speech fluency improves after he spends time with Father.[9] Father introduced into evidence a July 6, 2010 letter from his attorney to Mother's attorney asking Mother to schedule speech therapy for the child with a certain speech pathology group for the first available appointment. An August 20, 2010 followup letter from Father's attorney to Mother's attorney requested confirmation that the child had been taken to speech therapy as well as any records from such therapy. In the event that Mother had not taken the child to a speech therapist, the letter included a list of 17 providers covered under Father's insurance plan and instructions on how to secure insurance coverage for the therapy. Father said he got no substantive response from Mother or her attorney until Father's attorney received some documents on Son's speech therapy from Mother's attorney on December 10, 2010, the week before the scheduled hearing. When he tried to talk with Mother about it, Father said, she said only that, by the time she tried to arrange the speech therapy, "everything [was] booked," so the child was placed on a waiting list. The documents sent to Father's attorney reflected that the child was not evaluated by a speech therapist until October 11, 2010, after Father filed his contempt petition. Once Father finally received the documents on Son's therapy, he stated, he called the speech therapist and discovered that, out of the child's three speech therapy sessions, he was late for two sessions.

In response to Father's testimony, Mother claimed that she had done the best she could to follow the trial court's orders. She claimed that she called all of the speech therapists on Father's list but none returned her call. When she finally reached Son's current speech therapist, Mother stated, the child was placed on a waiting list to be evaluated. After Son was evaluated, Mother claimed, the therapist had only limited availability to see Son. Mother blamed the child for his tardiness to speech therapy sessions based on his after-school fatigue and general reluctance to attend.

---

[9]Mother agreed that Son's speech improved after spending time with Father.

Father and Mother agreed that, following the entry of the trial court's July 15, 2010 order requiring Mother to pay Father $2,000 in attorney fees, Mother made no payments until after Father filed the September Contempt Petition. After that, Father received a lump-sum payment from Mother of $2,000, the total amount of attorney fees due. Mother admitted this sequence of events, but said it was a result of her mistaken assumption that Father would simply deduct the fees from his child support payments.

Mother and Father also testified about Son's schooling. Father introduced into evidence the child's attendance records for the school year 2008-2009, Son's first year in kindergarten, and also for the current school year as of the time of trial. The records showed that, for the 2008-2009 school year, Son had been absent 44 days and tardy 39 days. As a result, Father testified, Son had to repeat kindergarten in the 2009-2010 school term. This was confirmed by a letter from the principal at the child's elementary school, entered into evidence. The letter went further, stating that Son had not mastered 22 out of 38 assessed skills during his first year of kindergarten, and that he was "at risk" in 4 of 6 areas. The letter also said: "The 2009-2010 school year began on August 10, 2009 and [Son] was registered at Germantown Elementary on September 2, 2009, missing 3 weeks of instruction." Father testified that, during the child's first half of first grade in the fall of 2010, he was tardy 13 times, had two unexcused absences, and there were five other instances in which he missed some or all of a school day based on illness.

In her testimony, Mother was asked about the child's school attendance. To explain why the child had missed so many days in previous school years, Mother said that Son "had bird flu or swine flu." She said that she did not have doctor's notes for all of the absences because she is "not really good with paperwork." Perhaps understating a bit, Mother conceded, "I'm not the best on attendance." Nevertheless, she felt that she had made improvements in that area. To explain the numerous tardy school days, Mother said only, "I'm not a morning person and they're not morning people," referring to her two sons. Mother acknowledged that Son was held back after his first year in kindergarten, but insisted that it was done at her suggestion, not based on his absences. She dismissed the letter from Son's school introduced into evidence by Father as a "hoax to try to make me look bad."

The trial court questioned Father about how he would take care of Son if he were designated as the primary residential parent. Father testified that he had worked out a way for Son to travel with him and receive homeschooling and speech therapy through online sources and private tutoring. Father asserted: "I want the best for my son. If it's me taking care of him I know I can do that."

On December 17, 2010, the trial court issued an oral ruling on the pending matters. It first found that Mother was again in criminal contempt of court for violating the trial court's

orders. On the issues related to contempt, the trial court credited Father's testimony and concluded that Mother's defiance of the court's prior orders was willful. Contrary to Mother's explanations of her behavior, the trial court found that Mother did not merely "slip" on some of her obligations: "She didn't comply with any of [her obligations] in that order. There was compliance after the petition was filed and when she was facing jail. And that is [Mother's] MO. She only complies when she has to." Consequently, the trial court partially lifted the suspension on the 50-day jail sentence for Mother meted out in the July 15, 2010 order, and it ordered Mother to serve three days in jail beginning that afternoon.

The trial court next addressed the larger issue of the designation of Son's primary residential parent. It found that a substantial and material change in circumstances had occurred, and that designating Father as Son's primary residential parent was in the child's best interest. The trial court explained its original decision to designate Mother as Son's primary residential parent: "This Court did not want to take this 7-year-old and put him in the custody of a father who travels the world regularly." However, after hearing the proof, the trial court concluded that Mother's failure to cooperate with Father, her failure to follow the trial court's orders, and her failure to adequately parent the child demonstrated that the change in designation of the primary residential parent was in the best interest of the child. On the same day, the trial court entered a preliminary written order incorporating its oral ruling by reference, designating Father as Son's primary residential parent and awarding Mother liberal alternate parenting time to be agreed upon by the parties.

On January 18, 2011, the trial court issued a comprehensive order on both of Father's contempt petitions. The order set forth the factual findings underlying the trial court's conclusion that Mother was in criminal contempt of its prior orders. The trial court found that Mother (1) failed to transport the child to school in a timely manner, (2) failed to timely secure speech therapy for the child, (3) failed to allow Father to exercise parenting time for half of the remaining part of the summer of 2010, (4) sent Father harassing text messages, (5) telephoned Father after hours for non-emergency reasons on September 20, 2010, (6) interfered with Father's telephone communication with Son, (7) failed to provide Father with a report of her psychiatric evaluation in a timely manner, and (8) failed to pay Father's attorney fees in the manner described in the order. Although the order required Mother to serve three days of her 50-day suspended sentence, by the time the written order was entered, that sentence had been served.

The order also addressed the change in the designation of primary residential parent. The order found that there had been a substantial and material change in circumstances, and that those changes necessitated a change in the designation of the child's primary residential parent to Father. The material changes listed in the order included Mother's interference with Father's relationship with the child, Mother's failure to get the child to school on time,

-10-

and Mother's failure to secure speech therapy for the child in a timely manner following the trial court's June 18 and July 15 orders. The order stated: "Mother has not lived up to her responsibilities as a parent," that she "has failed to place the child's best interests first," and that "there has been a total failure in parenting by Mother." These same findings were the basis for the trial court's ruling that the child's best interest would be served by designating Father as the primary residential parent. Finally, the order required Mother to pay Father $10,000 in partial payment of the attorney fees Father incurred in filing the contempt petitions.

On February 17, 2011, Mother filed a motion to alter or amend or for a new trial pursuant to Rule 59.04 or Rule 59.02 of the Tennessee Rules of Civil Procedure. Mother argued in the motion that the trial court erred in finding that Mother had willfully interfered with Father's summer parenting time, and in finding that she willfully failed to obtain speech therapy for Son in a timely fashion. She contended that there had been no material change in circumstances warranting the designation of Father as Son's primary residential parent.

On February 28, 2011, Mother filed an amended motion to alter or amend. She submitted new evidence showing that Mother had scheduled a speech therapy appointment for Son as early as July 21, 2010. Mother also asserted that Son's circumstances had deteriorated since Father was designated the child's primary residential parent. Specifically, Mother alleged that Father had enrolled the child in an unaccredited homeschool program, that he did not send the child's school books to Mother during her parenting time, and that the environment that Father and his girlfriend provided the child was a cause of concern for Mother. In support of her claims, Mother attached affidavits and copies of both pretrial and post-trial text message exchanges between Father and her. In a separate motion, Mother asked the trial court to stay execution of the January 18, 2011 order pending resolution of her post-trial motions.

On March 29, 2011, the trial court held a hearing on Mother's motion to alter or amend or for a new trial, as amended. At the hearing, the trial court indicated that the allegations by Mother that involved post-judgment facts were not an appropriate basis for altering its previous decision, but that they would be relevant to a new change in circumstances, going forward. Thus, the trial court declined to alter or amend its previous ruling. On April 25,

2011, the trial court entered an order denying Mother's motion to alter or amend or for a new trial.[10] From this order, Mother now appeals.[11]

## ISSUES ON APPEAL

On appeal, Mother argues overall that the trial court erred in holding her in criminal contempt of court. She asserts several bases for this argument:

1. The trial court erred in finding that Mother willfully interfered with Father's summer parenting time after the July 2, 2010 hearing;

2. The trial court erred in finding that Mother willfully failed to obtain additional speech therapy on behalf of the child in a timely fashion;

3. The trial court erred in finding that Mother willfully violated the July 15, 2010 order by sending Father harassing text messages on August 18, 2010, and October 20, 2010;

4. The trial court erred in finding that Mother willfully violated the July 15, 2010 order by calling Father at 12:53 a.m. on September 20, 2010;

5. The trial court erred in finding that Mother willfully violated the July 15, 2010 order by failing to allow Father telephone contact with the child on July 4, July 6, and days preceding July 28, 2010, and exercising telephone contact with the child while Mother was present in the vehicle with the child on July 20 and August 23, 2010;

6. The trial court erred in finding that Mother willfully violated the July 15, 2010 order in failing to obtain a psychiatrist evaluation prior to July 2, 2010, and failing to provide a copy of the psychiatrist report on June 13, 2010; and

7. The trial court erred in finding that Mother willfully violated the July 15, 2010 order by failing to pay attorney fees at the rate prescribed of $200 per month.

---

[10]Apparently out of an abundance of caution, the trial court certified the order as final and appealable pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. It appears that such certification was unnecessary to ensure that the parties could appeal the trial court's order.

[11]On May 13, 2011, Mother filed a motion for a stay of execution of the trial court's judgment pending this appeal. On May 26, 2011, the trial court denied Mother's motion for a stay.

In addition, Mother argues that the trial court erred in changing the designation of primary residential parent from Mother to Father.[12] As the standard of review for these issues varies, we will set forth the appropriate standard of review for each issue as it arises in the analysis below.

## ANALYSIS

### Criminal Contempt

Mother argues first that the trial court erred in holding her in criminal contempt of court on the seven counts listed above. We will outline the legal standard on this issue, and then analyze Mother's argument.

> The importance of the court's contempt authority cannot be understated:
> The power to punish for contempt is one of the most significant prerogatives of the Court of Justice. Upon its bold and prudent exercise depend the respect, the dignity, and efficiency of Courts as arbiters of human rights. The mandates of a Court . . . must in all cases be obeyed promptly, faithfully and without question or evasion. The party upon whom the order or command of the Court operates is not allowed to speculate upon the equity of the complaint, or the legality or regularity of the order, or decree, or of the writ issued thereon. His simple duty is to obey, and when he disobeys it is a duty the Court owes to itself and to the public to impose appropriate sanctions.

Gibson's Suits in Chancery, Eighth Ed., § 25.01 at 25-1; *see In re Lineweaver,* 343 S.W.3d 401, 413-14 (Tenn. Ct. App. 2010). Tennessee statutes governing the courts' contempt powers provide that Tennessee courts may "inflict punishments for contempts of court" in cases involving "[t]he willful disobedience or resistance of any . . . party . . . to any lawful writ, process, order, rule, decree, or command of such courts." Tenn. Code Ann. § 29-9-102(3) (2012). This statutory provision "enables the courts to maintain the integrity of their

---

[12]In the Statement of the Issues section of Mother's appellate brief, as the final issue on appeal, she lists the following: "The trial court erred in failing to set aside the January 18, 2011 judgment modifying the parenting plan order for fraud upon the Court perpetrated by Father." However, the Argument section of Mother's appellate brief does not include an argument on this issue. "The failure 'to cite to any authority or to construct an argument regarding [a] position on appeal' constitutes a waiver of the issue on appeal." *Rountree v. Rountree*, 369 S.W.3d 122, 135 (Tenn. Ct. App. 2012) (quoting *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006)); *see Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2009) ("This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in their brief."). Thus, we deem the issue to have been waived, and we decline to address it in this appeal.

orders." ***Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.,*** 249 S.W.3d 346, 354 (Tenn. 2008).

A finding of criminal contempt must be based on the following four elements: (1) the order that was allegedly violated must be lawful; (2) the order must be clear, specific, and unambiguous, (3) the order must actually be disobeyed or otherwise resisted; and (4) the violation of the order must be willful. ***Id.*** at 354-55. A person accused of criminal contempt is presumed innocent, and the four elements must be proven beyond a reasonable doubt. ***Cottingham v. Cottingham***, 193 S.W.3d 531, 538 (Tenn. 2006); ***Black v. Blount***, 938 S.W.2d 394, 399 (Tenn. 1996).

Once a guilty verdict is entered, the contemnor's presumption of innocence is removed and is replaced by a presumption of guilt. ***See Cottingham***, 193 S.W.3d at 538. Therefore, when the sufficiency of the evidence to support a criminal contempt finding is challenged on appeal, the defendant bears the burden of demonstrating why the evidence is insufficient to support the guilty verdict. ***Id.*** In conducting our appellate review, "the prosecution is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it." ***Id.*** Additionally, "[q]uestions regarding the credibility of witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact." ***Id.*** Thus, "this court must review the record to determine if the evidence in the record supports the finding of fact of guilt beyond a reasonable doubt, and 'if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt' we are to set aside the finding of guilt." ***Eastman v. Eastman***, No. M2007-01797-COA-R3-CV, 2008 WL 2600695, at *2 (Tenn. Ct. App. June 30, 2008) (quoting Tenn. R. App. P. 13(e)).

In the instant case, the trial court found Mother to be in willful violation of its previous orders in several respects. However, it is important to note that the trial judge did not impose a *new* punishment based on those violations. ***See*** Tenn. Code Ann. § 29-9-103 (2012). Instead, the trial court referred back to the 50-day jail sentence handed down in its July 15, 2010 order, which was conditionally suspended. The July 15, 2010 order stated that if Mother violated "*any* order of the court in the future, she will have to serve the [50-day] sentence imposed on her by this order." (Emphasis added). Once the trial court concluded in its January 2011 order that Mother had in fact violated prior orders, it merely lifted, in part, the suspension of Mother's 50-day sentence. Consequently, although the trial court made numerous findings of criminal contempt against Mother, she would have been subject to being required to serve the entire 50-day sentence for *a single* willful violation of a previous order. ***See Baker v. Baker***, No. M2010-01806-COA-R3-CV, 2012 WL 764918, at *11 ("If the defendant was placed on probation and thereafter violates conditions of his or her probation, the trial court has the authority to revoke the suspension of the sentence and,

among other alternatives, order the execution of the original sentence.").  For this reason, in order to uphold the trial court's decision to lift the suspension on Mother's sentence, we need only find that the evidence in the appellate record supports a finding that Mother was in criminal contempt of *any* of the trial court's orders.

We have thoroughly reviewed the substantial record in this cause.  From our review, we have found either undisputed evidence or admissions by Mother to support the criminal contempt findings as to at least two unambiguous provisions of the trial court's very detailed July 15, 2010 order.  We will review the evidence on Mother's violation of these two provisions.

In the first provision, the July 15, 2010 order mandated that "neither party shall . . . make phone calls to the other after 9:30 p.m. Central Standard Time," except that text messages could be sent in the event of an emergency concerning the child.  Mother admitted that, on September 19, 2010, she called Father at 11:54 p.m. Central Standard Time, when Father was scheduled to be at a work-related event in New Jersey very early the next morning.  Mother admitted that the call was not made for an emergency situation involving the child.  The only reason Mother gave for making this call was that she was having difficulty getting Son to sleep.  This undisputed evidence shows that Mother willfully violated the after-hours phone call restriction in the trial court's order, and we affirm the trial court's finding on this provision.

In the second provision, the July 15, 2010 order directed:  "Mother shall pay [$2,000 in attorney fees] at a rate of $200 per month, commencing August 2, 2010, and due on or before the second day of each month thereafter."  Mother conceded that she paid Father no attorney fees until after Father filed his September Contempt Petition.  After the September Contempt Petition was filed, she paid the entire amount of fees due.  Mother did not argue that she did not have the ability to pay the fees when they were due.  She claimed only that she was "mistaken" in assuming that Father was recouping the attorney fees by withholding from his child support payments to her.  The trial court chose not to credit Mother's testimony on this point; indeed, the trial court credited little of Mother's overall testimony.  When "the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Heffington v. Heffington*, No. M2009-00434-COA-R3-CV, 2010 WL 623629, at *2 (Tenn. Ct. App. Feb. 19, 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).  The trial court's order was crystal clear.  Giving due deference to the trial court's credibility determinations, the evidence in the record of Mother's overall behavior supports the trial court's finding that Mother made a deliberate, willful choice not to comply with the court's order until Father filed his contempt petition.  We affirm the trial court's finding on Mother's failure to comply with this provision.

Either of these willful violations of the July 15, 2010 order constituted a sufficient basis for the trial court to hold Mother in criminal contempt of court. As explained above, any single violation was sufficient to support the trial court's order lifting the suspension of the 50-day jail sentence imposed in the prior order. Accordingly, we affirm the trial court's finding that Mother was guilty of willful criminal contempt, and we affirm its decision to lift the suspension of Mother's 50-day sentence and to impose a three-day jail term.[13] This holding pretermits the other issues related to contempt that Mother raises on appeal.

## Modification of the Parenting Plan

Mother next argues that the trial court erred in modifying the parties' parenting plan to designate Father as the primary residential parent. Again, we outline the legal standard and then address Mother's arguments.

At the outset, we recognize the importance and delicacy of a court's decisions on the parenting of a child:

> No decisions in divorce cases require a more delicate touch than those involving child custody and visitation. Courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993). These decisions are not intended to reward or to punish parents, *see Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991), and, in fact, the interests of the parents are secondary to those of the children. *See Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992); *Griffin v. Stone*, 834 S.W.2d 300, 302 (Tenn. Ct. App. 1992).

*Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484-85 (Tenn. Ct. App. 1997).

"Child custody judgments are *res judicata* upon the facts existing at the time of the hearing." *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001) (citing *Hicks v. Hicks*, 176 S.W.2d 371, 374 (Tenn. 1943)). The trial court, however, "retains control over the custody of a minor child and may make such changes in the custody order as the exigencies of the

---

[13]It is undisputed that the trial court retained the discretion "to impose something less than the original sentence." *Baker*, 2012 WL 764918, at *11 (quoting *State v. Beard*, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005)).

case may require." *Id.* (citing *Adelsperger*, 970 S.W.2d at 485). The Tennessee statute governing modification of the existing parenting arrangement provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. . . . A material change in circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B) (2010). Thus, under the statute, the party seeking to change the designation of the primary residential parent has the burden of proving that (1) the child's circumstances have materially changed in a way that could not have been reasonably foreseen at the time of the original custody decision, and (2) the child's best interests will be served by changing the existing designation of primary residential parent. *Adelsperger*, 970 S.W.2d at 485; *see Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). Our Supreme Court has explained the analysis:

> While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well being.

*Kendrick*, 90 S.W.3d at 570 (citation omitted).

The trial court's holding on whether a material change in circumstances has occurred presents a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review this and all of the trial court's factual findings *de novo* on the record, with a presumption that the trial court's findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see Kendrick*, 90 S.W.3d at 569-70. As noted above, "great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary." *In Re: Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Thus, we accord considerable deference to findings of fact by the trial court that are based on credibility determinations. We review the

trial court's conclusions of law *de novo*, with no presumption of correctness. **Kendrick**, 90 S.W.3d at 569-70.

Although the trial court's factual determinations and conclusions of law must be reviewed under the above standards, the trial court's ultimate decision regarding the parties' parenting arrangements is discretionary. This includes its decision on what modifications, if any, to make once it finds a material change in circumstances. In light of the fact-specific nature of such decisions, appellate courts are reluctant to second-guess a trial court's decisions regarding parenting. **Parker v. Parker**, 986 S.W.2d 557, 563 (Tenn. 1999); **Nelson v. Nelson**, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). Accordingly, once we determine that the underlying factual findings are supported by a preponderance of the evidence, we will not disturb the parenting arrangement fashioned by the trial court unless that decision is based on an incorrect application of legal principles or is against logic or reasoning. **Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001); **Adelsperger**, 970 S.W.2d at 485.

### Material Change in Circumstances

The trial court explained its finding of a substantial and material change in circumstances as follows:

> Specifically, the Court finds the changes in circumstance include, but are not limited to, Mother's interference with Father's relationship with the child, Mother's failure to get the child to school on time which has resulted in excessive absences and tardies, and Mother's failure to secure speech therapy for the child in a timely manner following this Court's order. The Court finds that Mother is intent on remaining in Father's life to an inappropriate extent. In spite of Mother's explanations for her numerous violations of the Court's orders, the Court has grave concerns. Mother has not lived up to her responsibilities as a parent. She has failed to place the child's best interests first and the child's best interests are not being served in the custody of Mother. The Court finds that there has been a total failure in parenting by Mother.

Thus, the trial court determined that the behavior in which Mother continued to engage constituted a material change in circumstances that adversely affected the parties' child.

On appeal, Mother first argues that the evidence at trial preponderates against the trial court's finding that Mother failed to get the child to speech therapy in a timely manner. Mother notes that the child's need for speech therapy was either actually known or at least foreseeable to both parties as early as 2009, so this change would not be "unforeseeable."

-18-

She also argues that the trial court erred in basing its finding of a material change on Mother's inability to get the child to school on time. Mother contends that this, too, was foreseeable when the final decree of divorce was entered: "Father knew or had reason to anticipate no later than 2009 that Mother would be frequently tardy with getting the child to school." Regardless, Mother asserts, the chronic tardiness did not affect Son's well-being, as evidenced by the fact that the child had maintained very good grades in school. Thus, Mother argues that the evidence preponderates against the trial court's finding of a material change in circumstances that affected the child's well-being.

We first note that Mother was designated as the primary residential parent for the child in the February 19, 2010 parenting plan, which was incorporated into the parties' final decree of divorce. The final decree is the only order in the appellate record that contains a permanent adjudication of the primary residential parent. Consequently, the final decree is the operative order from which we assess whether a change in circumstances had occurred.[14] *See In re M.J.H.*, 196 S.W.3d 731, 742 (Tenn. Ct. App. 2005); *In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 WL 562754, at *17-18 (Tenn. Ct. App. Mar. 10, 2005). The issue, then, is whether the evidence preponderates in favor of the finding that a substantial and material change in circumstances occurred between the entry of the February 2010 final decree and the December 2010 hearing; specifically, a change that was not foreseeable by the parties and that negatively affected the child's well being.

We examine the factual findings that underlie the overall finding of a material change in circumstances. The trial court found that Mother was not diligent in securing appropriate speech therapy to address Son's speech disfluency. In its July 2010 order, the trial court ordered the parties to "cooperate in scheduling speech therapy for the child" and set a short deadline to report to the court on the status of the speech therapy. Despite the fact that it was undisputed that Son had an immediate need for speech therapy and the trial court's order clearly communicated urgency based on the child's needs, Mother was apparently unimpressed with the imperative that she take swift action to get Son's speech therapy lined up. In her own testimony, Mother protested that she "called everyone on that list" of speech therapists that Father provided to her. Of course, the list to which Mother refers was not sent to her until the middle of August 2010, a full month after the trial court's order, and it was sent as part of Father's effort to spur Mother into action. Nothing in Mother's testimony indicates that she took significant action before then, and she offers no explanation for why

---

[14]The trial court found that a material change in circumstances had occurred since the July 15, 2010 order. Because the July 15, 2010 order makes no permanent change in the parties' parenting arrangement, the assessment of a change in circumstances should be keyed off of the February 2010 final divorce decree. This discrepancy is not raised as an issue on appeal, and it does not affect our analysis.

she waited until August to act.[15] The evidence shows that Mother did not obtain an actual evaluation of the child until October 11, 2010, well into the school year, and coincidentally after Father filed his September Contempt Petition. The order directed Mother to cooperate with Father, and the evidence in the record shows that Mother did not even communicate with Father about securing speech therapy for the child, despite Father's repeated requests for such information. Affording appropriate deference to the trial court's credibility determinations, we find that the evidence preponderates in favor of the trial court's finding that Mother slow-walked her efforts to secure speech therapy for Son, and failed to communicate and cooperate with Father on her efforts, all to the detriment of the child.

Mother also argues that the evidence does not support the trial court's finding that Mother interfered with Father's relationship with Son. We disagree. The evidence fully supports the trial court's finding. At times, Mother cooperated with Father, such as arranging his parenting time around his irregular work schedule. However, Father testified that on numerous occasions, Mother was resistant to Father's parenting time and used the necessary communications on parenting time arrangements as an opportunity to antagonize and bait Father. The trial court credited Father's testimony, and the October 20, 2010 text exchange corroborates his testimony. The evidence also shows that Mother obstructed the father-son relationship and inserted herself into it by not facilitating their telephone conversations or by having Son return Father's telephone calls only in Mother's presence, such as in her car. Giving appropriate deference to the trial court's credibility determinations, we hold that the evidence preponderates in favor of the trial court's finding that Mother interfered with Father's relationship with the child.

Perhaps the most compelling evidence establishing a change in circumstances affecting the child's well-being is Mother's admitted chronic failure to get the child to school every day, and on time. Not that a parenting plan provision should be necessary on such a basic requirement, but the parties' February 2010 Parenting Plan mandates that "[e]ach of the parties shall ensure that the child arrives at school and/or his scheduled activities on time." The child's school records, described above, show that Mother was not fulfilling this basic responsibility. In 2009, the child was required to repeat kindergarten because he had missed 44 days and was tardy 39 days the year before. Mother emphasizes that her efforts in the Fall 2010 semester were greatly improved, as the child was tardy "only" 13 days and had "only"

---

[15]With her motion to alter or amend, Mother submitted new evidence indicating that Mother had scheduled an appointment for the child with a local university on July 21, 2010, but the appointment was cancelled because the child needed to see a specialist. Mother offers no explanation, however, for why she did not reference this in her testimony. The trial court was well within its discretion to refuse to consider such late-filed evidence at that point. Moreover, even if it were considered, the overall evidence supports the trial court's impression that Mother's efforts during the summer of 2010 were *de minimus* at best.

two unexcused absences. Improvement or not, the trial court was entitled to look at, stated plainly, whether Mother was getting the job done. Based on this evidence, she was not.

Mother argues on appeal that her inability to consistently get the child to school every day and on time was foreseeable based on her past performance, so her failure to do so cannot now be the basis of a finding of a material change in circumstances. This is an interesting though ultimately unpersuasive argument. The fact that a custodial parent has had past problems that were known by the parties does not leave the court powerless to make a change in parenting arrangements if the custodial parent's problems resurface, or continue, to the detriment of the child. For example, in *Staggs v. Staggs*, No. M2001-01192-COA-R3-CV, 2002 WL 31769112 (Tenn. Ct. App. Dec. 11, 2002), a custodial mother, known to be an alcoholic, relapsed. Describing the caselaw on foreseeability as "a poor fit for a situation like the present one," the appellate court held that the fact that the parties knew that the mother had a history of substance abuse did not prevent the court from ordering a custody change based on the relapse. *Id.* at *4; *see also Groce v Groce*, No. M2008-01516-COA-R3-CV, 2009 WL 3295269, at *4 (Tenn. Ct. App. Oct. 13, 2009) (finding a material change in circumstances based on the three children's poor attendance record at school). Here, Mother can rightfully be expected to meet the basic requirement of getting the child to school every day and on time; indeed, the parties' Parenting Plan, signed by Mother, explicitly addressed this. The trial court's finding on this issue is supported by a preponderance of the evidence, and it can be used as part of the trial court's overall basis for determining whether there has been a material change in circumstances.

In the alternative, Mother argues that even if her behavior was a material change in circumstances, the proof did not show that it negatively impacted the well-being of the child, because he continued to make good grades in school. We reject this argument as well. The fact that Son may have persevered in his school studies despite adverse circumstances does not preclude the trial court from inferring that his overall well being was negatively affected. *See Staggs*, 2002 WL 31769112, at *4-5.

In the case at bar, the trial court found that Mother interfered with Father's parenting time, failed to address the child's speech therapy needs, failed to consistently get the child to school in a timely manner, and overall failed to "live[] up to her responsibilities as a parent," and that this constituted a substantial and material change in circumstances that negatively affected the child's well-being. After a careful review of the record, we hold that a preponderance of the evidence in the record supports this finding.

We consider now the trial court's holding that the child's best interest was served by designating Father as Son's primary residential parent.

***Best Interest***

The trial court determined that having the child reside primarily with Father was in the child's best interest, despite the fact that Father travels extensively for his work and that consequently the child would have to be homeschooled, at least in part while traveling with Father. The trial court explained its decision in its oral ruling:

> This child's best interest is not being served in the custody of the mother. This Court did not want to take this 7-year-old and put him in the custody of a father who travels the world regularly. But I specifically said that he was to be given half of the remaining time in the summer. That didn't happen. He was specifically to be able to reach his son on the phone. That didn't happen. Alarmingly, his son called [Father] at midnight and [Mother] had no believable reason for why a 7-year-old was up at midnight and calling his father, waking him up in the middle of a [work event].
>    The Court believes that this is [Mother's] way of continuing to try to control [Father]. This child is being used as a pawn. The Court finds that there is a change in circumstances in this child's best interest. In spite of the traveling he will get an education from traveling.

The trial court's January 2010 written order included similar findings and found further that Father was capable of providing a safe and stable environment for the child:

> This Court had reservations about placing custody of a seven-year old with his father who travels the world regularly. However, the Court finds that it is in the child's best interests that Father be designated as the child's primary residential parent. The Court finds that Father is capable and able of providing a safe and stable environment for the child. Father has represented to the Court that the child will travel with Father as he works and that he will enroll the child in a home schooling program, which he will monitor with the assistance of tutors if necessary. Father also has represented that he will secure speech therapy for the child.

On appeal, Mother argues that the trial court erred in determining that Son's best interests were served by designating Father as the child's primary residential parent. At the time of the hearing, she argues, Son was performing well in school, and he was beginning to work with a new speech therapist. Retaining Mother as the primary residential parent, she argues, would provide stability and continuity and overall serve the child's best interests, considering all of the relevant statutory factors.

Mother correctly notes that, in determining whether a change in primary caretakers was in Son's best interest, the trial court was required to consider all relevant factors, including those set forth in Tennessee Code Annotated § 36-6-106(a):

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . .;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

*        *        *

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (Supp. 2012).

As Mother correctly notes, courts faced with a request for modification of the designation of a child's primary residential parent emphasize the importance of continuity in the child's life, and so are normally disinclined to change the original designation. This is based on the premise that children tend to thrive in a stable environment. *Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn. 1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). Clearly the trial court considered continuity in this case. The trial judge expressed her initial

reluctance to change the designation of primary residential parent, especially in light of Father's work, which involves frequent travel and an irregular schedule. Indeed, Mother had a golden opportunity to create a stable, healthy environment to raise Son and facilitate parenting time for Father in keeping with his work schedule. Alas, it was not to be. The evidence found credible by the trial court demonstrated that Mother either did not fulfill a number of her basic parental responsibilities to this child, or that she finally did so only under imminent threat of jail time. The statute directs the trial court to take into account many factors, including the parties' "past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents . . . ." Tenn. Code Ann. § 36-6-106(a)(10). The trial court found that Mother was not fostering Father's relationship with the child, but was instead interfering with it and was using the child as a "pawn" to control and antagonize Father. Although this misbehavior may have served Mother's psychological needs in the wake of the parties' divorce, it surely did not serve the needs of the parties' child. The trial court also determined that, for his part, Father was a capable parent and that he had made adequate preparations for the safety and security of the child while in his care. All of these findings were supported by a preponderance of the evidence.

Under all of these circumstances, we cannot conclude that the trial court abused its discretion in determining that the child's best interests would be served by designating Father as the child's primary residential parent.[16] This holding by the trial court is affirmed.

**Attorney Fees on Appeal**

Father argues that he is entitled to an award of his attorney fees incurred in this appeal, pursuant to the attorney fee provisions in the MDA and in the parties' Parenting Plan, and pursuant to Tennessee statute. The MDA provides in paragraph 19:

> In the event that it should be determined, either by this Court or by any court of competent jurisdiction, that either party has willfully breached any provision of this Agreement, then the breaching party shall pay to the other party all

---

[16]Mother filed supplemental authority to support her position that a finding of criminal contempt "cannot be utilized to determine custody or visitation." *See Slagle v. Slagle*, No. E2011-00785-COA-R3-CV, 2012 WL 1525013, at *10-11 (Tenn. Ct. App. Apr. 30, 2012); *Baker v. Baker*, No. M2010-01806-COA-R3-CV, 2012 WL 764918, at *11 (Tenn. Ct. App. Mar. 9, 2012). The trial court in this case based its decision on factors that affected the child's well-being. While some of the behaviors that the trial court considered also were the subject of contempt findings, the record does not indicate that the trial court based its modification of the designation of primary residential parent on the fact that Mother had willfully disobeyed its orders. Therefore, we find these cases inapposite.

reasonable attorneys' fees and costs incurred in the enforcement of such provision or provisions as such are adjudged by the Court upon full hearing.

Similarly, the parties' Parenting Plan provides:

In the event that it should be determined, either by this Court or by any other court of competent jurisdiction, that either party has breached any provision of this Plan, then the breaching party shall pay to the other party all reasonable attorneys' fees and costs incurred in the enforcement of any such provision or provisions as such are adjudged by the Court upon full hearing.

These provisions indicate that Father would be entitled to all costs incurred, including appellate attorney fees, if Mother is deemed to have willfully breached the MDA or the Parenting Plan. The trial court held Mother in willful contempt of its orders and granted Father the requested modification of the parenting arrangement based on conduct that would also constitute a willful breach of the MDA and the Parenting Plan. Therefore, we grant Father's request for attorney fees and costs incurred in this appeal, pursuant to these provisions.

The cause is remanded to the trial court for a determination of the amount of the reasonable attorney fees and costs.

### CONCLUSION

The decision of the trial court is affirmed, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed to Appellant S.A.M.D. and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE